## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**BUENA VISTA ESTATES, INC.,**
**a New Mexico Corporation,**

**Plaintiff,**

**vs.**                                                    **Civ. No. 15-cv-217 JCH**

**SANTA FE SOLID WASTE MANAGEMENT**
**AGENCY and SANTA FE COUNTY,**

**Defendants.**

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on *Defendants' Motion To Dismiss and Supporting Authority*. [Doc. 5] Defendants move to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. Defendants filed a Response [Doc. 17], and Plaintiff filed a Reply [Doc. 18].

Having reviewed the motion, briefs, and relevant law, the Court concludes that the motion should be granted. The case will therefore be dismissed.

### FACTUAL BACKGROUND

The following summary of statements and factual allegations,[1] taken from the Complaint, views the facts in the light most favorable to Plaintiff. [Doc. 1, pp. 1-12] *See Archuleta v. Wagner*, 523 F.3d 1278, 1283 (10th Cir. 2008).

---

[1] The Court notes that the Complaint mixes factual allegations and legal assertions and conclusions in sections entitled "Background" and "Introduction." This summary, taken from those sections of the Complaint, includes some conclusions of law. The Court accepts as true all well pleaded facts, but does not accept as true legal conclusions or legal conclusions couched as factual allegations. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Where necessary to the Court's decision, any allegations not accepted as true will be specifically discussed below; where not necessary to the decision, however, the Court will not separate legal conclusions from factual allegations.

The Santa Fe Solid Waste Management Agency ("SFSWMA") was created in 1995 as a joint authority of the City of Santa Fe and Santa Fe County ("SFC").  The purpose of SFSWMA was to create, maintain, and operate a landfill for use by residents of the City of Santa Fe and Santa Fe County.

SFSWMA began operations at the Caja del Rio Landfill in 1997.  Caja del Rio has a solid waste landfill permit.  The original plan called for soil cover from each disposal cell to be removed and stored until used for final covers of compacted solid waste.  The basalt bedrock was to be blasted into lumps and transported to a storage waste (tailings) pile located next to the landfill disposal area.  For many years, the basalt was considered a waste product.

Randall Kippenbrock, director of SFSWMA,  later determined that the basalt could be crushed and sold as aggregate.  SFSWMA and SFC entered into an eight-year contract with Del Hur Industries to crush and sell aggregate materials from the Caja del Rio Landfill.  Kippenbrock's July 23, 2014 letter to the Board of County Commissioners states that it is estimated there is a stockpile of 1.6 million tons of unprocessed basalt at the landfill, which is anticipated to take eight to sixteen years to sell.  [Doc. 1, pp. 16-17]  The letter expresses the opinion that another basalt rock quarry is not needed in Santa Fe County.

The Complaint asserts:  "In the operating agreement between SFSWMA, SFC and Del Hur Industries, rather than indicate they will operate under an appropriate County special use permit and County conditions, they attempt to contract for typical and required special use provision in lieu of obtaining appropriate zoning and special use permits."  [Doc. 1, p. 6, ¶ 2] The Complaint further asserts:  "SFSWMA and SFC knowingly formed the mining operation of Caja del Rio Landfill without proper permitting and zoning for the operation."  [Doc. 1, p. 6, ¶ 3]

There has been no public notice by SFSWMA of Caja del Rio's aggregate production blasting and sale of aggregate.

On November 8, 2013, Plaintiff Buena Vista Estates submitted an application to SFC for approval to create a mining zone to allow the extraction of aggregate for use as a construction material. After various reviews and hearings, the second public hearing before the Board of County Commissioners ended on August 12, 2014, without Plaintiff's application having yet been approved.

On September 16, 2014, the Board of County Commissioners of Santa Fe County adopted Ordinance No. 2014-8: "An Emergency Interim Development Ordinance Imposing a Twelve Month Moratorium on Development Approvals or the Issuance of Development Permits for Specified Developments of Countywide Impact" (the "Moratorium"). [Doc. 1 (Exhibit B), pp. 18-22] The Moratorium only applies to: (1) landfills, (2) junkyards, and (3) "sand and gravel extraction activity requiring blasting." [Doc. 1, p. 20, Sec. 4] The Moratorium does not apply to "sand and gravel extraction that does not require blasting." [Doc. 1, p. 20, Sec. 5.5]

The Moratorium recites that: the Board of County Commissioners previously found that Developments of Countywide Impact ("DCIs") have potential for far reaching effects on the community; DCIs are "developments that would place major demands on public facilities, the County's capital improvement plan and budget, and/or have the potential to affect the environment and public health, safety, and welfare beyond the impacts on immediately neighboring properties"; DCIs have the potential to create serious adverse noise, light, odor and vibration, explosive hazards, traffic congestion, and burdens on county emergency response services. [Doc. 1, p. 19, Sec. 3.1] The Board therefore found that special regulation of DCIs was necessary for the following purposes:

3

3.1.1.  to protect the health, safety and welfare of the citizens, residents, and businesses of the County from the potentially harmful or hazardous impacts of DCIs;

3.1.2.  to ensure short and long-term compatibility (both on-site and off-site) of DCIs and the County at large;

3.1.3.  to preserve the quality and sustainability of life, the economy, infrastructure, environment, natural and cultural resources, and natural landscapes; and

3.1.4.  to protect the degradation of air, surface water and groundwater, soils, environmentally sensitive lands and visual and scenic qualities.

[Doc. 1, p. 19]  The Board found that existing regulations of the specified DCIs[2] were non-existent or inadequate to meet the special regulatory needs identified in Sections 3.1.1 to 3.1.4, and that a twelve-month moratorium on new applications and approvals was necessary to allow development of regulations for these DCIs.  [Doc. 1, p. 19, Secs. 3.3, 3.4, 3.6]

The Moratorium states that it is based on the County's "express and implied zoning authority and police power," under NMSA 1978, § 3-21-1 (2007) (granting counties zoning authority, including the power to regulate and restrict the "location and use of buildings, structures, and land for trade, industry, residence or other purposes"), and NMSA 1978, § 4-37-1 (1975) (granting counties "those powers necessary and proper to provide for the safety, preserve the health, promote the prosperity and improve the morals, order, comfort and convenience of any county or its inhabitants").

## PROCEDURAL BACKGROUND

Plaintiff filed the Complaint on March 13, 2015.  [Doc. 1]  Count I asserts a claim under the Sherman Antitrust Act, 15 U.S.C. § 1.  Count II asserts a claim under the New Mexico Antitrust Act, NMSA 1978, §§ 57-1-1 to -19 (1995).

---

[2] The reference is to the DCIs specified in Section 4 of the Moratorium:  landfills, junkyards, and sand and gravel extraction activity requiring blasting.

This Court has jurisdiction over this case.  *See* 28 U.S.C. § 1337; 15 U.S.C. §§ 15, 26. The Court has jurisdiction over the claim under the New Mexico Antitrust Act.  *See* 28 U.S.C. § 1367.

## LEGAL STANDARDS

### I. Rule 12(b)(6)

On a motion to dismiss, the court assesses the legal sufficiency of the allegations contained within the four corners of the complaint.  *Archuleta v. Wagner*, 523 F.3d 1278, 1281 (10th Cir. 2008).  Rule 8 requires the complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The court accepts as true all well-pleaded facts, viewing them in the light most favorable to the plaintiff and allowing all reasonable inferences in favor of the plaintiff.  *Archuleta*, 523 F.3d at 1283.  This deference is inapplicable to legal conclusions in the complaint.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court "should disregard all conclusory statements of law and consider whether the remaining specific factual allegations, if assumed to be true, plausibly suggest the defendant is liable." *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011); *see Iqbal*, 556 U.S. at 678.  The court does not accept as true a legal conclusion couched as a factual allegation.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

The complaint "does not need detailed factual allegations," but the factual allegations "must be enough to raise a right to relief above the speculative level."  *Id*.  The complaint must go beyond "an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Iqbal*, 556 U.S. at 678.  Conclusory statements unsupported by factual allegations are not sufficient.  *Id*.; *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678; *see*

*Twombly*, 550 U.S. at 555 (holding that mere "labels and conclusions" and "formulaic recitation of the elements of a cause of action" are insufficient); *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008).

The allegations of fact must "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Archuleta*, 523 F.3d at 1281, 1283.  "The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief."  *Robbins*, 519 F.3d at 1247.  The Tenth Circuit observed that "plausible" cannot mean "likely to be true," but "must refer to the scope of the allegations in a complaint:  if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'"  *Id.* (quoting *Twombly*, 550 U.S. at 570).

## II.  Antitrust Immunity

Section 1 of the Sherman Act makes unlawful "every contract, combination … or conspiracy, in restraint of trade or commerce among the several States."  15 U.S.C. § 1.  In *Parker v. Brown*, the Supreme Court established "state action immunity."  *Parker v. Brown*, 317 U.S. 341, 350-51 (1943).  *Parker* held that the Sherman Act was not intended "to restrain state action or official action directed by a state."  *Id.* at 351.  "States may regulate economic activity as they wish, pursuing even patently anticompetitive policies without having to look over their shoulders to see if Congress approves."  *Kay Elec. Coop. v. City of Newkirk*, 647 F.3d 1039, 1042 (10th Cir. 2011).

Because substate governmental entities—including municipalities and counties—are not sovereign, state action immunity under *Parker* does not apply to them directly, but they do receive immunity "when they act 'pursuant to state policy to displace competition with regulation

or monopoly public service.'" *FTC v. Phoebe Putney Health Sys., Inc.*, ___ U.S. ___, 133 S. Ct. 1003, 1010, 185 L.Ed. 2d 43 (2013) (quoting *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 413 (1978) (plurality opinion)).  "[I]f a *state* expressly adopts an anticompetitive policy and chooses to use its municipal subdivisions as instruments to effect that policy, then the federal-state comity concerns undergirding the *Parker* state immunity doctrine *do* come into play."  *Kay Elec. Coop.*, 647 F.3d at 1042.  A municipality or county "shares the state's 'immunity' when but only when it is implementing anticompetitive policies authorized by the state."  *Id.*

## DISCUSSION

### I.  Federal Antitrust Law

Citing the Sherman Antitrust Act, 15 U.S.C. § 1, Count I of the Complaint asserts that SFC and SFSWMA "have unreasonably challenged restraint of trade in the relevant markets by knowingly joining together to operate an unpermitted and illegally zoned sand and gravel operation while opposing legal competition."  [Doc. 1, p. 12]  Defendants characterize the Complaint as alleging an antitrust violation based on the conjunction of two acts:  (1) operating a sand and gravel operation at the Caja del Rio Landfill, including blasting; and (2) at the same time imposing a moratorium on granting new permits and approvals for sand and gravel extraction activities involving blasting.  [Doc. 5, p. 2]  Defendants argue that SFC is immune from federal and state antitrust laws.

As the Court understands the Complaint and Response, Plaintiff agrees with Defendants' characterization of the basis for its antitrust claims:  anticompetitive conduct by engaging in its own sand and gravel business by marketing basalt, while SFC's Moratorium prevents the entry of

new parties into that business.  [Doc. 17, pp. 2-3]  Plaintiff responds that SFC is deprived of immunity under the "market participant" exception:

> The Defendants are not immune from federal and state antitrust claims because they are market participants in the local and regional sand and gravel market, utilizing anti-competitive practices.
>
> . . . .
>
> Santa Fe County's antitrust liability arises first from its anticompetitive use of zoning powers.  Though municipalities have been given wide latitude to engage in anticompetitive practice through the use of zoning ordinances following the Supreme Court's decision in *City of Columbia*, 499 U.S. 365, 111 S. Ct. 1344 (1991), Santa Fe County's use of them exceeds the scope contemplated by *City of Columbia* because the County is also a market participant in the area it is regulating.

[Doc. 17, pp. 2, 10; *see id.* p. 7 ("The facts, accepted as true, show and support that the Defendants are market participants.")]  Thus Plaintiff concedes that SFC would normally have state action immunity when utilizing its zoning powers.  Plaintiff presents two arguments that SFC was deprived of immunity in this case:  (A) Plaintiff relies squarely on the "market participant exception"; and (B) Plaintiff relies on the letter from Randall Kippenbrock, Executive Director of SFSWMA.

**A.  State Action Immunity**

Defendants assert that the Moratorium is authorized by state law.  As the Moratorium recites, its enactment is authorized under New Mexico statute, Section 3-21-1,  granting counties zoning authority, including the power to regulate and restrict the "location and use of buildings, structures, and land for trade, industry, residence or other purposes."  "Restrictions upon the use of one's property are imposed by state and local governments pursuant to police power."  *Brazos Land, Inc. v. Bd. of Cnty. Comm'rs*, 1993-NMCA-013, ¶ 29, 848 P.2d 1095, 1101.  "The United States Supreme Court has long held that governments may, pursuant to police power, adopt

zoning ordinances that regulate the manner in which real property may be used."  *Id*.  When zoning is used to promote the public interest, it is upheld as a legitimate exercise of the police power.  *Id*.  Applying these principles, the New Mexico Court of Appeals upheld the county's enactment of a moratorium for the purpose of promulgating more stringent waste disposal requirements.  *Id*. ¶¶ 29-30, 848 P.2d at 1101.  As in *Brazos Land*, enactment of the Moratorium by SFC is an exercise of the zoning authority granted by the State of New Mexico under Section 3-21-1.  Plaintiff does not dispute this argument or conclusion.

Defendants further argue that the exercise of zoning authority is inherently anticompetitive.  Thus SFC's grant of zoning authority allowed suppression of competition.

In *Omni*, the Supreme Court held that the city's ordinance restricting the size, location, and spacing of billboards necessarily protected existing billboards against some competition from newcomers.  *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 373 (1991).  Thus, the Court held, the city was prima facie entitled to *Parker* immunity.  Columbia Outdoor Advertising ("COA") controlled more than 95% of the relevant market by 1981.  *Id*. at 367.  The mayor and other city council members were personal friends of COA's majority owner; COA and its officers occasionally contributed funds and free billboard space to their campaigns.  *Id*.  Omni began erecting billboards in 1981.  *Id*. at 368.  COA met with City officials to seek enactment of zoning ordinances restricting billboard construction; ultimately, in 1982, the City passed a new ordinance restricting billboards, which obviously benefitted COA and severely hindered Omni's ability to compete.  *Id*.  Omni brought an antitrust suit, asserting a "secret anticompetitive agreement" in which the City and COA would each use its power and resources to protect COA's monopoly position.  *Id*. at 367-68.

The Supreme Court recognized in *Omni* that the state statutes under which the City acted authorized municipalities to regulate the use of land and the construction of buildings and other structures, and that these statutes authorized the City to regulate billboards. *Id*. at 370-71. The Court rejected the argument that the City would lose *Parker* immunity if the City acted beyond its delegated authority—i.e., if the nature of its regulation were substantively or procedurally defective; to allow such a challenge under antitrust law would undermine *Parker* and the federalism interests it was designed to protect. *Id*. at 372-73. State action immunity requires that there be "'clear articulation of a state policy to authorize anticompetitive conduct,'" at least as the "foreseeable result." *Id*. (quoting *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 40, 42 (1985)). The Supreme Court held that the zoning authority granted to the City entailed authority to suppress competition: "The very purpose of zoning regulation is to displace unfettered business freedom in a manner that regularly has the effect of preventing normal acts of competition, <u>particularly on the part of new entrants</u>." *Id*. at 373 (emphasis added). It was not required that suppression of competition was explicitly permitted; instead, the Court held that it is enough "if suppression of competition is the 'foreseeable result' of what the statute authorizes." *Id*. at 372-73. "A municipal ordinance restricting the size, location, and spacing of billboards (surely a common form of zoning) necessarily protects existing billboards against some competition from newcomers." *Id.* at 374. The Supreme Court concluded that the City's restriction of billboard construction was prima facie entitled to *Parker* immunity. *Id.* at 374.

As in *Omni*, SFC was given the authority to regulate by the state's grant of zoning power, and that zoning power may have the effect of suppressing competition. As in *Omni*, the Moratorium "necessarily protected existing [sand and gravel extraction businesses] against some competition from newcomers." As in *Omni*, the very purpose of SFC's Moratorium was "to

displace unfettered business freedom in a manner that regularly has the effect of preventing normal acts of competition, <u>particularly on the part of new entrants</u>" like Plaintiff Buena Vista Estates. SFC determined that the Moratorium was necessary for the purposes set forth in Sections 3.1.1 to 3.1.4—purposes in accordance with those in NMSA 1978, § 3-21-1 (2007).

Citing *Kay Electric*, Plaintiff argues that "the Tenth Circuit noted that a state hasn't authorized all forms of municipal anticompetitive conduct just because it has authorized some," and the county "must demonstrate that the state authorized the <u>specific</u> anticompetitive conduct at issue," this "particular monopolistic conduct."  [Doc. 17, pp. 12-13]  *See Kay Elec. Coop.*, 647 F.3d at 1044.  If Plaintiff means to say that the state must have specifically authorized SFC to restrict new sand and gravel extraction activity requiring blasting, Plaintiff misapprehends the relevant principles.  The *Omni* Court rejected this degree of specificity.  *See Omni*, 499 U.S. at 373 n.4.  The anticompetitive conduct at issue specifically authorized by the state is zoning regulation, which is inherently anticompetitive and which "regularly has the effect of preventing normal acts of competition, particularly on the part of new entrants," as stated in *Omni*, 499 U.S. at 373.  The state has specifically authorized SFC to exercise zoning authority, regulating and restricting the use of land.  *See* NMSA 1978, § 3-21-1.  The Moratorium regulating one use of land is an incident of this specific grant of general zoning authority.

Citing *Midcal*, Plaintiff mentions that in addition to a clearly articulated state policy, there must be active supervision by the state.  *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105 (1980).  [Doc. 17, p. 12]  Plaintiff does not, however, argue that this requirement applies here and was not satisfied.  And, as Defendants observe in their Reply, this case involves local governmental entities that "are not subject to the 'active state supervision requirement.'"  *Phoebe Putney Health Sys*, 133 S. Ct. at 1011 (stating that active

11

state supervision requirement only applies to private parties).   [Doc. 18, pp. 5-6]   The reason is that local government entities "have less of an incentive to pursue their own self-interest under the guise of implementing state policies."   *Id*.   There is no need to require the state to actively supervise a local government entity's execution of a properly delegated function—here, zoning regulation.   *See Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 46-47 (1985).

Defendants argue that their operation of the Landfill is authorized by state law.   [Doc. 5, pp. 6-7]   Both cities and counties are authorized to regulate collection and disposal of refuse, and to operate refuse disposal areas and facilities including landfills.   *See* NMSA 1978, § 3-48-2 (1965) (city); NMSA 1978, § 4-56-3 (1971) (county).   SFSWMA was created to jointly exercise this authority to operate a landfill.   [Doc. 5, p. 7 & n.1 (citing Joint Powers Agreement Act, authorizing public agencies to create an administering agency to jointly exercise a common power, NMSA 1978, §§ 11-1-3, 11-1-5)]   As Plaintiff admits in the Complaint, "Caja del Rio operates under EPA and State standards for landfills, and has a solid waste landfill permit." [Doc. 1, p. 3]   Defendants assert that their operation of the Landfill, including the basalt processing operations, is properly authorized.

The Court recognizes, however, that Plaintiff alleges that the Landfill is "unpermitted and illegally zoned."   Although the Complaint "does not need detailed factual allegations," these overly general and conclusory allegations are not sufficient.   *Twombly*, 550 U.S. 544, 555; *see Iqbal*, 556 U.S. at 678; *Hall*, 935 F.2d at 1110.   The Court accepts only well pleaded facts, not conclusory allegations.   *See Mitchell v. King*, 537 F.2d 385, 386 (10th Cir. 1976).   Moreover, these allegations appear to be legal conclusions couched as factual allegations—which the Court does not accept as true on a motion to dismiss.   *See Twombly*, 550 U.S. at 555.   The Complaint would need more detailed factual allegations about the existing permit and zoning, together with

12

citation of applicable laws or regulations regarding permitting and zoning; a determination that the Landfill's activities were "unpermitted" or "illegally zoned" would be a conclusion of law reached by application of those laws or regulations to the facts.  The Court disregards conclusory statements of law in considering a Rule 12(b)(6) motion.  *See Kansas Penn Gaming, LLC*, 656 F.3d at 1214.

The Court further observes that Plaintiff undercuts its argument of permit and zoning violations somewhat by admitting:   "The landfill permit and the Solid Waste Act may contemplate and to a limited extent govern the blasting and excavation of basalt rock"; and: "even if a sold waste permit under the Solid Waste Act allows blasting and stockpiling of waste basalt material, it does not permit the processing, crushing, screening, stockpiling and transporting of the aggregate materials."  [Doc. 17, pp. 3, 9]  These admissions appear to show that Plaintiff's antitrust claims are based instead on the conjunction of the Moratorium with participation in the market.

Even if the Court were to take as true the allegations of an "unpermitted and illegally zoned" Landfill, however, that does not affect the antitrust analysis discussed above.  As the Supreme Court observed in *Omni*, the "antitrust court" is not transformed into "the standard reviewer" whenever a plaintiff alleges "that the governmental body, though possessing the power to engage in the challenged conduct, has actually exercised its power in a manner not authorized by state law."  *Omni*, 499 U.S. at 371-72.  Once it has been established that SFC has zoning authority under state statute, and that both a city and county have authority to establish and operate a landfill, further review of exactly how that authority was exercised is not "a federal antitrust job," but instead a matter for state review upon a claim of state statutory violations.  *Id.* at 372.

13

The Court concludes that Defendants are "prima facie entitled to *Parker* immunity," as in *Omni*. 499 U.S. at 374. Plaintiff makes two arguments that Defendants are deprived of this state action immunity. Plaintiff's primary argument is that the "market participant exception" precludes state action immunity. [Doc. 17, pp. 2, 7, 10-11] In addition, Plaintiff attached the Kippenbrock letter to the Complaint, and argues that this letter shows "Defendants' clear intention and efforts to maintain a monopoly."

### B.  Market Participant Exception

Plaintiff argues that "Defendants are not immune from federal and state antitrust claims because they are market participants in the local and regional sand and gravel market, utilizing anti-competitive practices." [Doc. 17, p. 2] But the Supreme Court has not established a "market participant exception." In *Omni*, the Supreme Court did not adopt such an exception—instead, merely recognizing in dicta a "possible" exception to the broad principle reaffirmed in that case: "We reiterate that, with the possible market participant exception, *any* action that qualifies as state action is *'ipso facto* … exempt from the operation of the antitrust laws.'" *Omni*, 499 U.S. at 379 (quoting *Hoover v. Ronwin*, 466 U.S. 558, 568 (1984)); *see id.* at 374-75 (observing "this immunity does not necessarily obtain where the State acts not in a regulatory capacity but as a commercial participant in a given market"). In 2013, the Supreme Court recognized that it had not established a market participant exception, stating that *Omni* had left the question open and declining to "recognize and apply a 'market participant' exception to state-action immunity" because the argument was not raised by the parties or ruled on by the lower courts. *Phoebe Putney Health Sys., Inc.*, 133 S. Ct. at 1010 n.4.

The only authority cited by Plaintiff in support of a market participant exception is the Tenth Circuit opinion in *Kay Electric Cooperative*. [Doc. 17, pp. 11-12] Plaintiff argues: "The

State of New Mexico did not intend to establish a municipal aggregate materials monopoly through the conferral of zoning powers and the grant of a solid waste disposal permit"; and: "The state did not clearly articulate or affirmatively express a policy favoring Defendants' monopolization of aggregate reclamation and sale simply because Caja del Rio Landfill was given a solid waste disposal permit and engages in solid waste collection and disposal activities." [Doc. 17, p. 11]  Plaintiff's argument concludes:  "Therefore, the anticompetitive conduct Santa Fe County has engaged in by placing a moratorium on Plaintiff's permit application while concurrently favoring and participating in their own aggregate reclamation and sale operation could not have been contemplated by the legislature as a consequence of the Solid Waste Act." [Doc. 17, pp. 11-12]  Plaintiff's argument misapprehends the applicable principles, erring in focusing on the Landfill's solid waste permit.  The point is that the zoning authority granted to SFC under NMSA 1978, Section 3-21-1, constitutes a "clear articulation of a state policy to authorize anticompetitive conduct," because the "very purpose of zoning regulation is to displace unfettered business freedom in a manner that regularly has the effect of preventing normal acts of competition, particularly on the part of new entrants."  *Omni*, 499 U.S. at 372-73 (internal quotation marks omitted).  It is not required that the state be shown to have specifically intended that a "municipal aggregate materials monopoly" result.  *See City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 415 (1978) ("This does not mean, however, that a political subdivision necessarily must be able to point to a specific, detailed legislative authorization before it properly may assert a *Parker* defense to an antitrust suit."); *Paragould Cablevision, Inc. v. City of Paragould*, 930 F.2d 1310, 1312 (8th Cir. 1991) (stating *Louisiana Power & Light Co.* "has made clear that a specified, detailed legislative authorization of monopoly service need not exist to infer the necessary state intent" (internal quotation marks omitted)).  What is required is

that the state authorized SFC to regulate zoning, despite the fact that anticompetitive conduct of some kind may be the regular result.  *See Omni*, 499 U.S. at 373; *Louisiana Power & Light Co.*, 435 U.S. at 415 (stating that an "adequate state mandate for anticompetitive activities of cities and other subordinate governmental units exists when it is found from the authority given a governmental entity to operate in a particular area, that the legislature contemplated the kind of action complained of" (internal quotation marks omitted; emphasis added)).

As the Reply argues, Plaintiff's description of the alleged anticompetitive behavior here is substantially similar to the circumstances of *Omni* (unless a "market participant exception" were applicable).  In *Omni*, the City's use of its zoning power to restrict billboards favored an existing billboard business and was detrimental to a newer company's ability to compete.  Here, SFC's use of its zoning power favored the existing operation, which marketed basalt, and was detrimental to a newcomer to the market, Plaintiff.

The distinction between *Omni* and this case is that SFC has a commercial interest in the existing operation.  Plaintiff argues that this distinction is significant because of the market participant exception, which Plaintiff asserts was "articulated by the Tenth Circuit in *Kay Electric*."  [Doc. 17, p. 11]   As Defendants argue, however, *Kay Electric* did not adopt the market participant exception.  [Doc. 18, pp. 3-4]

Instead, *Kay Electric* involved the issue of whether the state had authorized anticompetitive conduct.   The Tenth Circuit concluded that the state "expressed a clear preference for, not against, competition" for electricity services in annexed areas, with statutes specifically sanctioning a "battle for electricity customers in annexed areas."  *Kay Electric*, 647 F.3d at 1044-45.   Contrasting the circumstances in *Hallie*, in which "the city's conduct was just the sort of thing the state legislature had authorized," the Tenth Circuit stated that "there's

nothing on Oklahoma's statute books to suggest that the legislature authorized the species of antitrust violation alleged here—refusing to provide an end customer one service (sewage) unless he purchased something entirely different (electricity)."  *Id.* at 1046-47.  The fact that the city was a market participant was merely an incidental fact; the decision turned on the fact that the state had done the opposite of authorizing anticompetitive conduct.  The Tenth Circuit did not use the term "market participant exception," or cite the dicta in *Omni* regarding a "market participant exception."  Neither the language nor the analysis of *Kay Electric* supports Plaintiff's reliance on a market participant exception having been adopted in the Tenth Circuit.

Defendants further argue that they were not market participants, at any event, citing authority that a governmental entity does not become a market participant because of actions incidental to its primary activity.  [Doc. 18, p. 5]  *See Wooster Indus. Park, LLC v. City of Wooster*, 55 F. Supp. 3d 990 (N.D. Ohio 2014) (holding City not a market participant when it earned rental income from permitting company to collocate on a cell tower owned by City); *Wheeler v. Beard*, No. Civ. A. 03-4826, 2005 WL 1217191 (E.D. Pa. 2005) (unpublished)[3] (holding that Department of Corrections' agreements with vendors to provide goods to inmates was "purely incidental" to the primary purpose of operating prisons).  This analysis gains credence from the Supreme Court's citation in *Omni* of an example of what it would mean to be a "market participant":  *Union Pacific R. Co. v. United States*, 313 U.S. 450 (1941).  In that case, Kansas City, Kansas, constructed, and was the owner and operator of, a wholesale produce market.  The project was formulated in conjunction with the Union Pacific Railroad, and the City gave rebates and concessions to entice prospective tenants to move from an old market (in Kansas City, Missouri) to the new one.  *Id.* at 457-58.  The rebates and concessions were held unlawful under the Elkins Act, which prohibits concessions in respect to transportation.  *Id.* at

---

[3] The Court cites this and other unpublished opinions for their persuasive value.  *See* 10th Cir. R. 32.1(A).

1072.  In citing *Union Pacific* as an example of a market participant, the Supreme Court in *Omni* stated that Kansas City, Kansas, was acting "not in a regulatory capacity but as a commercial participant in a given market."  *Omni*, 499 U.S. at 374-75.  In *Union Pacific*, no regulatory purpose was involved.  In contrast, SFC and SFSWMA are acting primarily in their state-approved capacities to exercise zoning authority and to operate waste disposal facilities; sale of basalt is a mere byproduct of these primary roles.  The Court concludes, however, that, in absence of persuasive authority for adoption of a market participant exception, it need not reach this further argument.

Plaintiff assumes that a market participant exception exists.  Plaintiff provides no authoritative caselaw, and no reasoned or persuasive analysis, to support the adoption of a market participant exception.  Plaintiff provides no analysis of the limits of such an exception when sale of basalt is merely a byproduct of Defendants' acting in their regulatory capacity, rather than Defendants' primary activity.  Without authority from the Supreme Court or the Tenth Circuit, this Court declines to adopt a market participant exception.

The Court thus concludes that Defendants' sale of basalt does not deprive them of state action immunity under *Parker*.

### C.  Randall Kippenbrock letter

Plaintiff argues that the Kippenbrock letter shows "Defendants' clear intention and efforts to maintain a monopoly on a sand and gravel operation—not just landfill operations."  [Doc. 17, p. 11]  Defendants' Motion argues that this communication is protected by the *Noerr-Pennington* doctrine, which holds that:  "The federal antitrust laws also do not regulate the conduct of private individuals in seeking anticompetitive action from the government."  *Omni*, 499 U.S. at 379-80; *see E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 141 (1961);

*United Mine Workers v. Pennington*, 381 U.S. 657, 670 (1965).  [Doc. 5, p. 10]  "That a private party's political motives are selfish is irrelevant:  '*Noerr* shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose.'"  *Omni*, 499 U.S. at 380 (quoting *Mine Workers*, 381 U.S. at 670).  Once a governmental entity "establishes it is entitled to state action immunity, the subjective motivation of the actors involved in the decisionmaking process should not come into play."  *Allright Colorado, Inc. v. City of Denver*, 937 F.2d 1502, 1511 (10th Cir. 1991); *see Omni*, 499 U.S. at 377.

Under the *Noerr-Pennington* doctrine, Kippenbrock's letter—even if it were by a private party—does not support an antitrust claim; the Court concludes that the doctrine applies to this letter from the director of a government agency.  *See Manistee Town Ctr. v. City of Glendale*, 227 F.3d 1090, 1093 (9th Cir. 2000) (applying doctrine to lobbying by city); *Mariana v. Fisher*, 338 F.3d 189, 200 (3d Cir. 2003) (holding that the doctrine applies to government as well as private actors).  Plaintiff's Response makes no response to this argument, set forth in Defendant's Motion.

If Plaintiff meant to suggest the Kippenbrock letter evidenced a conspiracy, that claim would also be unavailing.  *Omni* held that there is no conspiracy exception to state action immunity.  *Omni*, 499 U.S. at 374.  It "is both inevitable and desirable that public officials often agree to do what one or another group of private citizens urges upon them"; if "'conspiracy' means nothing more than an agreement to impose the regulation in question, … such an exception would virtually swallow up the *Parker* rule:  All anticompetitive regulation would be vulnerable to a 'conspiracy' charge."  *Id.* at 375.  *Omni* rejected a conspiracy exception between a local government entity and a private company.  On the same analysis, the Court concludes that

there is no conspiracy exception to state action immunity in this case, involving two governmental entities.

### D.  Conclusion on Count I

The Court concludes that SFC and SFSWMA are entitled to state action immunity, and the Complaint should be dismissed for failure to state a claim.

## II.  New Mexico Antitrust Act

Count I under federal antitrust law and Count II under New Mexico antitrust law make the same claims.  [Doc. 1, pp. 12-14]  Plaintiff's Response confirms that the claims and the applicable analysis are the same.  [Doc. 17, p. 10]

The language of the New Mexico Antitrust Act, NMSA 1978, §§ 57-1-1 to -19 (1995), is virtually identical to that of the federal antitrust law.  Section 57-1-16 provides:

> Nothing contained in the Antitrust Act is intended to prohibit actions which are:
>
> A. clearly and expressly authorized by any state agency or regulatory body acting under a clearly articulated and affirmatively expressed state policy to displace competition with regulation; and
>
> B. actively supervised by the state agency or regulatory body which is constitutionally or statutorily granted the authority to supervise such actions when the agency or regulatory body does not have any proprietary interest in the actions.

The New Mexico Legislature explicitly provided that New Mexico's Antitrust Act should follow the same judicial interpretations as federal antitrust law.  Section 57-1-15 states:

> Unless otherwise provided in the Antitrust Act, the Antitrust Act shall be construed in harmony with judicial interpretations of the federal antitrust laws. This construction shall be made to achieve uniform application of the state and federal laws prohibiting restraints of trade and monopolistic practices.

Plaintiff provides no claim or argument that the same result should not obtain under the New Mexico Act as under federal antitrust law.  The Court therefore concludes, on the same analysis discussed above, that the Complaint under New Mexico's Antitrust Act should be dismissed for failure to state a claim.

      **IT IS THEREFORE ORDERED** that:

*Defendants' Motion To Dismiss and Supporting Authority* [Doc. 5] is **GRANTED**.

 

 

_____

**UNITED STATES DISTRICT JUDGE**